UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEBRA GASTON,<br><br>    Plaintiff,<br><br>v.<br><br>MICHAEL ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | Case No. 10 C 7447<br><br>Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

In this social security appeal, plaintiff, Debra Gaston, moves to reverse and remand the final decision by the Commissioner of the Social Security Administration denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (doc. #19). After the Commissioner's initial denial of her disability applications on December 4, 2007 (R. 65), and on reconsideration on February 11, 2008 (R. 58), Ms. Gaston sought and received a hearing before an administrative law judge ("ALJ") on March 30, 2009 (R. 358). Ms. Gaston appeared at the hearing *pro se* (R. 360). On August 28, 2009, the ALJ issued a written decision denying Ms. Gaston's applications for SSI and DIB (R. 20). The Appeals Council denied review, and Ms. Gaston timely filed suit in this Court (doc. # 1). The Commissioner has filed a cross-motion for summary judgment to affirm the denial of Ms. Gaston's application (doc. # 26). For the reasons set forth below, we grant plaintiff's motion for remand, and deny the Commissioner's motion to affirm.

---

[1] On February 9, 2011, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 14).

**I.**

The administrative record establishes that Ms. Gaston was born on March 18, 1956, and was 49 years old as of her alleged disability onset date of March 1, 2006 (R. 74). She stands 5 feet, 6 inches tall, and as of April 23, 2009, weighed 240 pounds (R. 257). Ms. Gaston moved in with her adult daughter not long before her administrative hearing (R. 362). Ms. Gaston has been divorced twice (R. 75), and currently has no income. She has an 8th grade level of education, with no specialized job training or vocational school education (R. 112).

From 1993 to 1994, Ms. Gaston worked as a meat packer for Iowa Beef Processors, and from 1996 to 2006, she worked as a bindery operator for various companies (R. 127). She briefly worked at Chicago Envelope in 2007, earning $7,652.96 (which the ALJ found did not rise to the level of "substantial gainful activity") (R. 21). Ms. Gaston was let go from that job because, in her words, she "couldn't function" because of memory problems (R. 362).

Ms. Gaston claims she is disabled due to hypertension, problems with her knees and legs, and problems with her memory (R. 108, 136). Further, she alleges that her hands and back often hurt (R. 135). She has become "slowed by arthritis" and was experiencing high blood pressure around the time of the administrative hearing (R. 363).

Some of these complaints are evidenced in the medical record. On May 16, 2007, Ms. Gaston visited Gottlieb Memorial Hospital complaining of severe lower back pain (R. 179-80). She was taking Prednisone to help manage the pain (*Id.*). An x-ray taken of the lumbar spine that day revealed "moderate degenerative disc disease at L5 and S1 and mild degenerative disc disease at L1-2 with mild degenerative spurring of the lumbar vertebrae" (R. 184). The report also noted

"severe degenerative arthritis of the facet joints [located between the vertebrae] at L4-5 and L5-S1" (R. 191), which can cause back pain.

Ms. Gaston was examined by DDS physician, Mahesh Shah, M.D., on November 14, 2007 (R. 201). Dr. Shah noted that Ms. Gaston complained of back and knee pain as well as hot flashes, forgetfulness, and "gaining a lot of weight" (*Id.*). At the time of examination, Ms. Gaston weighed 213 pounds (R. 202). While Dr. Shah's examination revealed "mild tenderness" over Ms. Gaston's knees and right lower back, she could bear her own weight, ambulate without assistance, had a normal gait, and had "fairly good range of motion" in her back (R. 203-04). Dr. Shah noted that Ms. Gaston had mild hypertension, and that "vague symptoms such as hot flashes, amenorrhea, forgetfulness, gaining weight, [and] inability to function" were "possibly related to her menopausal symptoms" (R. 204).

A second DDS physical examination was conducted on November 29, 2007, by Norma Villanueva, M.D. (R. 207). Dr. Villanueva recorded Ms. Gaston's complaints of pain in her knees and legs, a "problem with her memory," and light headedness (R. 207-08). Ms. Gaston's weight was 208 pounds at the examination (R. 208). Ms Gaston reported that her knee problems began about two years before, and her memory problems started about one year prior (R. 207). She could not remember how to use a computer even after being given instructions (*Id.*). Dr. Villanueva noted bruises on Ms. Gaston's upper and lower extremities, and she reported that Ms. Gaston's knees were swollen, tender, and warm, with crepitus (a crackling or grating sound) (R. 208-09). Ms. Gaston was "mildly able to do heel, toe, squat and tandem gait maneuvers," and her gait was "slow" (*Id.*). Dr. Villanueva opined that Ms. Gaston suffered from uncontrolled hypertension, arthralgia (joint pain) in both knees with "possible arthritis," and "varicosities in both legs" (R. 209).

3

Ms. Gaston was assessed by DDS psychologist, Helen Appleton, PhD, on November 30, 2007 (R. 216). Dr. Appleton stated that Ms. Gaston was "depressed and forgetful," but concluded that Ms. Gaston's limitations were due only to physical pain, and her mental impairments were non-severe (R. 216, 219, 228). Dr. Appleton found only mild functional limitations in Ms. Gaston's activities of daily living ("ADLs"), noting that Ms. Gaston goes to the store to shop weekly, cleans her house, does laundry, drives, reads, takes care of her grandfather, and cooks (R. 226-28). Ms. Gaston reported constant pain in her legs (R. 228). She does not need reminders to take her pain medication, but Ms. Gaston stated that she does need help caring for herself because of the pain (*Id.*). In addition, she has hot flashes, amenorrhea, forgetfulness, weight gain, and problems functioning, which Dr. Appleton stated was all possibly related to menopausal symptoms (*Id.*).

On December 3, 2007, Dr. Robert Patey completed a physical residual functional capacity ("RFC") assessment on Ms. Gaston, listing her primary diagnosis as hypertension, with no secondary diagnosis (R. 237). Based on the findings of the two examining DDS physicians, Dr. Patey opined that Ms. Gaston can occasionally lift and/or carry up to 50 pounds, frequently lift or carry up to 25 pounds, and stand and/or walk, or sit, for about six hours during an eight-hour workday, with an unlimited ability to push and/or pull, and no postural, manipulative, visual, communicative, or environmental limitations (R. 231-34).

On February 6, 2008, Terry Travis, M.D., reviewed the documentary evidence, including Dr. Patay's report, and concluded that Ms. Gaston was able to perform "a wide range of medium work" (R. 240). Dr. Travis further opined that Ms. Gaston could return to her past work as a packer-bindery operator (*Id.*). He noted that there was no new evidence that countered this physical RFC determination (*Id.*).

On September 7 and September 13, 2008, Ms. Gaston visited the Westlake Hospital emergency room complaining of severe pain in her lower back (R. 275, 283). A cervical spine exam conducted on December 10, 2008, confirmed the presence of arthritis in her back (R. 248). A knee examination done that same day noted arthritis in Ms. Gaston's knees (R. 251).

On February 4, 2009, Ms. Gaston visited Westlake Medical Associates, complaining of a severe headache and chest pain. The physician noted that Ms. Gaston had uncontrolled hypertension and recommended she check into the emergency room (R. 261-63). Ms. Gaston refused to go to the emergency room, and the physician gave her two prescriptions to control the hypertension (*Id.*).

## II.

Ms. Gaston appeared *pro se* at the March 30, 2009 hearing. The ALJ, John Kraybill, told Ms. Gaston that an attorney may be able to "better assist [her] in presenting [her] case," and advised her that it was his policy to "give one postponement, and only one postponement, if [she] wished to seek representation" (R. 360). Ms. Gaston stated that she would proceed that day (R. 361).

The ALJ first asked Ms. Gaston about her most recent employment. At first, Ms. Gaston could not remember the name of the company she had worked for, but eventually remembered that it was Chicago Envelope (R. 362). The ALJ asked why she had left that job, and Ms. Gaston told him she had been let go because she "couldn't function" and "couldn't remember stuff" (R. 362-63).

The ALJ then asked Ms. Gaston to describe the primary reasons she felt she could not work a regular job. Ms. Gaston said: "I cannot lift. I can't sit for a long period of time, and my hands and my back. I have become slowed with arthritis, and now I'm having a problem with blood pressure" (R. 363). The ALJ asked Ms. Gaston if she was taking medication for her blood pressure problem, and she said that she was, but could not remember the name of the medication (R. 364). The ALJ

5

then asked questions related to Ms. Gaston's previous use of medication. She stated that she had taken blood pressure medication very briefly a "few years back" but had stopped taking it as she did not like the way it made her feel (R. 365).

Ms. Gaston testified that she had to stop working as a bindery operator because she was in so much pain (R. 367). She said that she had been working seventy hours a week, "constantly taking Tylenol or Advil for the pain because I didn't realize I had the arthritis until I finally broke down and had to go to the hospital" (*Id.*). Ms. Gaston began to explain her symptoms, saying that she "got soreness from lifting," but was interrupted by the ALJ, who queried more about how she realized that she had arthritis (R. 367-68). Ms. Gaston stated that she was told at Stroger Hospital that she had arthritis (R. 368).

The ALJ concluded his questions by asking Ms. Gaston if there were any impairments that had not been discussed (R. 369). Ms. Gaston answered "Just loss of memory. I'm like I'm forgetting something. That's the only reason with my last job with Chicago Envelope I was forgetting a lot of stuff. I don't know why...." (*Id.*). Ms. Gaston testified that she has told doctors about her memory loss, but that doctors at Stroger and Westlake told her it could be menopause-related (R. 369-70).

The VE, Edward Pagella, then gave his testimony (R. 372). The VE stated that he had reviewed the exhibits and listened to the testimony, and that he did not have any questions for the claimant (*Id.*). The VE described Ms. Gaston's past relevant work as a meat packer and bindery packer, both of which are unskilled occupations, with a medium level of physical tolerance (R. 373). The ALJ confirmed that the VE's testimony was consistent with the DOT, but the ALJ asked the VE no further questions (*Id.*). The ALJ asked Ms. Gaston if she had any questions for the VE, and she

6

replied that "I was going to ask him something and I forgot. Let's see. I hate this" (*Id.*). The ALJ said she should just describe what work she has done in the past, and Ms. Gaston described herself as hard-working (*Id.*). The hearing concluded nineteen minutes after it began (R. 374).

### III.

In his written opinion of August 28, 2009 (R. 19-26), the ALJ determined that Ms. Gaston is not disabled. The ALJ applied the five-step sequential analysis required to assess a claim of disability. *See* 20 C.F.R. § 404.1520(a)(4). At Step 1, the ALJ found that Ms. Gaston has not engaged in substantial gainful activity since the alleged onset date of March 1, 2006 (R. 21). At Step 2, he found that Ms. Gaston had several severe impairments – degenerative disc disease of the lumbar spine, osteoarthritis of the knees, and hypertension – as well as non-severe depression (R. 22). In Step 3, the ALJ found that while her physical impairments "cause[d] more than minimal limitations in [Ms. Gaston's] ability to engage in work activity on a regular and continuous basis" (*Id.*), none of them individually or in combination met or medically equaled one of the listed impairments (R. 23). The ALJ explained that there was no evidence that Ms. Gaston was unable to ambulate effectively, no objective evidence of any nerve root or spinal cord compression, and no objective evidence of vascular deficiency or resulting heart disease (*Id.*).

The ALJ then determined that Ms. Gaston had an RFC to perform the full range of light work (R. 23), which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," 20 C.F.R. § 404.1567(b), and "requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" or sitting for 6 hours while pushing or pulling arm or leg controls. S.S.R. 83-10. In determining this RFC, the ALJ found that while Ms. Gaston's medically determinable impairments could reasonably be expected to cause the

alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the RFC determination (*Id.*).

The ALJ supported his finding by noting that a May 2007 lumbar spine x-ray demonstrated "only moderate degenerative disc disease" and that DDS examiner Dr. Shah had noted "fairly good range of motion" in Ms. Gaston's lower back (R. 24). And while Ms. Gaston had been diagnosed with arthritis in her knees, "no treating source has expressed an opinion of any greater limitation, functionality, than that set forth herein" (*Id.*). The ALJ also noted that treatment notes indicated that Ms. Gaston's hypertension was uncontrolled because she did not take her prescribed medications or follow her prescribed treatment. The ALJ felt this "suggest[ed] [Ms. Gaston's] symptoms may not be as debilitating as alleged" (*Id.*).

The ALJ additionally stated that the objective medical evidence did not support the degree of limitations alleged, as Ms. Gaston is "able to ambulate without any assistance, and there is no evidence that she is unable to sit, stand or walk for up to 6 hours in an 8 hour workday" (R. 24). The ALJ stated, however, that he was giving less weight to Dr. Patey's finding that Ms. Gaston could perform medium work, because evidence he recently received demonstrated greater limitations from Ms. Gaston's back and knee impairments (*Id.*). The ALJ did not discuss the evidence of Ms. Gaston's forgetfulness, or her obesity.

Using the RFC of a full range of light work, the ALJ found at Step 4 that Ms. Gaston was not able to perform her past relevant work as a packer, binding operator, and meat packer as those positions were at a medium level of exertion (R. 25). He also determined that Ms. Gaston's age placed her in the category of "closely approaching advanced age" and that transferability of job skills would not be an issue as Ms. Gaston's past relevant work was unskilled (*Id.*).

8

At Step 5 the ALJ found that there are jobs that exist in significant numbers in the national economy that Ms. Gaston could perform, but he did not specify which jobs these were (R. 25). While a VE testified at the hearing, the ALJ did not reference this testimony in his opinion; and, indeed, at the hearing the VE was not asked, and did not testify, about the kinds of light exertion jobs available.

## IV.

We begin our analysis of the Commissioner's decision by laying out the governing legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The social security regulations impose five steps that the ALJ must evaluate sequentially to determine whether a claimant is considered disabled under the law. These steps are: (1) whether the claimant is currently performing any "substantial gainful activity;" (2) whether her alleged impairment or combination of impairments is severe; (3) whether any of her impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether she is unable to perform her past relevant work based on her RFC: and (5) whether her RFC renders her unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). The claimant has the burden of proof in Steps 1 through 4, and the burden shifts to the Commissioner in Step 5. 20 C.F.R. §§ 404.1520(g); *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

Judicial review of ALJ decisions is deferential: we uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). To meet this standard, the ALJ's opinion must build an accurate and logical bridge between the facts of the case and the outcome. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). The ALJ must consider all relevant evidence, and may not selectively discuss only the evidence which favors his or her ultimate conclusion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

## V.

Ms. Gaston presents several grounds for reversal and remand of the ALJ's decision. We address the issues determinative of our decision to remand this case: the ALJ's failure to obtain a valid waiver of counsel, and his corresponding failure to develop a full and fair record.

## A.

Ms. Gaston, now represented by counsel, argues that the ALJ failed to obtain a valid waiver of counsel at the hearing. A social security claimant has a statutory right to counsel under 42 U.S.C. § 406. This right to counsel may be waived provided the claimant is "given sufficient information to enable him to intelligently decide whether to retain counsel or proceed *pro se*." *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991). To ensure a valid – *i.e.*, knowing and intelligent – waiver of counsel at a Social Security hearing, an ALJ must explain to *pro se* claimants the information set out in *Thompson*: "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney

10

fees to 25 percent of past due benefits and required court approval of the fees." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Thompson*, 933 F.2d at 584).

The Commissioner does not (and cannot) dispute that the ALJ failed to inform Ms. Gaston of the second and third *Thompson* factors, and does not attempt to defend the adequacy of the waiver (doc. # 27: Def.'s Mem. at 5). We find that Ms. Gaston's waiver of counsel was invalid.[2]

## B.

That finding does not end the inquiry. As the Commissioner correctly points out, an invalid waiver of counsel may constitute harmless error if, in the absence of counsel for the claimant, the ALJ nonetheless fully and fairly developed the record for the *pro se* claimant. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). To satisfy this duty, the ALJ must "scrupulously and conscientiously probe into, inquire of and explore for all of the relevant facts," *Skinner*, 478 F.3d at 841-42, including "prob[ing] the claimant for possible disabilities and uncover[ing] all of the relevant evidence," *Binion*, 13 F.3d at 245. While a claimant normally shoulders the burden of showing that

---

[2]The Court notes that Ms. Gaston appears to have been mailed a leaflet entitled "Your Right to Representation," which includes explanations of how an attorney can assist a Social Security claimant; how much money the attorney may be paid; and how a claimant may receive free legal assistance (R. 52-53). The Seventh Circuit has not ruled whether a claimant's receipt of written materials that set forth the *Thompson* factors is sufficient to establish a claimant's knowing waiver, and district courts in this Circuit differ on this question. *Compare Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *10 (W.D. Wis. July 29, 2005) (holding that "mailing written notices to plaintiff could satisfy the Commissioner's burden, but only if the ALJ establishes at the hearing that the claimant received, read, and understood the notices"), *with Smith v. Astrue*, --- F. Supp.2d ---, 2011 WL 2470877, at *7 (N.D. Ill. June 21, 2011) (holding that the claimant's receipt of a document explaining the *Thompson* factors was enough to constitute a valid waiver where the claimant had signed a notice confirming that she had received that document). Inasmuch as the Commissioner does not raise this mailing, and does not argue that it was sufficient to establish a valid waiver of counsel, we offer no view as to whether – or in what circumstances – a claimant's receipt of written materials explaining the right to counsel may substitute for a full disclosure of the *Thompson* factors on the record at the hearing.

an ALJ failed to fully and fairly develop the record, that burden shifts to the Commissioner when a claimant proceeds *pro se* and the ALJ does not obtain a valid waiver of counsel. *Id.*[3]

Ms. Gaston argues that the ALJ failed to fully and fairly develop the record because he did not take into account – indeed, did not mention – her alleged obesity or memory loss in his opinion. "Although *pro se* litigants must furnish some medical evidence to support their claim, the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information." *Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (internal citations omitted). Though "the court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather," *Nelms*, 553 F.3d at 1098, "[a]n ALJ is required to consider impairments a claimant says [s]he has, or about which the ALJ receives evidence." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). This is a failure to fully and fairly develop the record where the ALJ's omission was significant (*i.e.*, prejudicial) because he failed to consider "specific, relevant facts." *Nelms*, 553 F.3d at 1098 (internal citations omitted). For the reasons we explain below, the Court concludes that this is what happened in Ms. Gaston's case.

1.

*First*, Ms. Gaston argues that the ALJ did not adequately develop the record as to her memory problems. She alleged memory problems as one of her impairments on her original application for benefits (R. 108), and Ms. Gaston's daughters both wrote that Ms. Gaston has

---

[3]The Commissioner attempts to shift this burden back to Ms. Gaston by arguing that if Ms. Gaston claims prejudice from the ALJ's failure to probe further into her disabilities, she was required to submit with her brief in this Court a sworn statement as to what testimony she would have supplied to further develop the record (Def.'s Mem. at 5). The Commissioner cites no authority for this proposition, and we decline to adopt this requirement.

memory loss problems (R. 148, 173-74). The DDS examiners also noted that Ms. Gaston claimed she suffered from memory loss or forgetfulness (*see* R. 201, 207-08, 216-28). In addition, at the hearing, which lasted a mere nineteen minutes (R. 360, 375), Ms. Gaston testified that memory loss was one of her impairments (R. 369), and that this impairment caused her to lose her most recent job (R. 362-63). At several points in the hearing, Ms. Gaston replied that she could not answer the ALJ's questions because she could not remember the answers (*see, e.g.*, R. 362-63 (her most recent job); 364 (her medications), 373 (her intended questions for the VE)).

Despite this evidence in the record and Ms. Gaston's testimony as to her memory loss, the ALJ did not mention Ms. Gaston's memory problems in his written opinion. While the ALJ referenced the psychiatric review form completed by Dr. Appleton, which opined that Ms. Gaston had non-severe depression and forgetfulness, the ALJ only reviewed Dr. Appleton's assessment of Ms. Gaston's depression (R. 22). Further, while the Commissioner's brief highlights portions of Dr. Appleton's report which suggest that Ms. Gaston's memory loss was mild (Def.'s Mem. at 6), the ALJ did not mention this in his opinion. We cannot speculate as to whether the ALJ considered Dr. Appleton's opinion on Ms. Gaston's memory loss when the ALJ formulated his opinion. Rather, "[t]he ALJ must build an accurate and logical bridge between the evidence and his conclusions, and [a reviewing] court must confine its review to those reasons that the ALJ supplies for the decision." *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010); *see also Stewart v. Astrue*, 561 F.3d 679, 384 (7th Cir. 2009). Having no indication that the ALJ explored any of the relevant facts relating

to Ms. Gaston's alleged memory loss, or its effect on her ability to work, we conclude that the ALJ did not meet his burden of fully and fairly developing the record.[4]

**2.**

*Second*, Ms. Gaston argues that the ALJ did not fully and fairly develop the record as to her obesity. The ALJ did not mention Ms. Gaston's weight in his opinion, and at the hearing failed to question Ms. Gaston on how obesity may affect her. Although Ms. Gaston did not claim obesity as an impairment on either her application for benefits or at the hearing, if references to her weight in the medical records are sufficient to alert the ALJ to the impairment, the ALJ's failure to consider whether obesity is an impairment is error. *Skarbek*, 390 F.3d at 504.

There was sufficient evidence in the record of Ms. Gaston's obesity to trigger the ALJ's duty to consider its potential impact on the disability question. On November 14, 2007, Ms. Gaston told DDS examiner Dr. Shah that she had gained weight in the past six months, and his notes indicate that weight gain was one of the factors she said contributed to her disability (R. 201). Dr. Shah noted that Ms. Gaston's weight was 213 pounds, and he opined that her weight gain was likely attributable to menopause (R. 202, 204). More recently, on February 1, 2009, Ms. Gaston reported that one of her reasons for going to the emergency room was that she had gained 40 pounds in the past six months (R. 293). The related physical examination chart called Ms. Gaston "overweight" (R. 294). Indeed, Ms. Gaston's height (5'5") and weight (213 pounds) give her a body mass index ("BMI") of

---

[4]Ms. Gaston also argues that the ALJ should have ordered a mental consultative examination to fairly and fully develop the record on her memory loss (doc. # 19: Pl.'s Mem. at 8). Although ordering a consultative mental examination is generally within the ALJ's discretion, on remand, the ALJ should consider whether such an examination here might resolve any "conflict, inconsistency, ambiguity or insufficiency in the evidence," *Griffith v. Callahan*, 138 F.3d 1150, 1153 (7th Cir. 1998) (overruled on other grounds) (citing 20 C.F.R. § 416.919a(b)), such as between the medical evidence and the testimony of Ms. Gaston and her daughters, or whether a consultative mental examination might shed light on if there is an ascertainable medical basis for the alleged memory loss.

35.44, which is described as Class 2 obesity. *See* http:www.bmi-calculator.net (last visited December 16, 2011).

The Court cannot determine at this stage that the ALJ's failure to consider Ms. Gaston's weight was harmless error. Generally, if an ALJ adopts the limitations recommended by the claimant's treating physicians, who were aware of the claimant's weight issues, the error is harmless. *Skarbek*, 390 F.3d at 504. Here, however, even if the DDS examiners were aware of Ms. Gaston's weight issues, the ALJ did not adopt the limitations recommended by these physicians. The DDS examiners opined that Ms. Gaston could perform medium work, while the ALJ determined that, based on evidence he recently received that the physicians did not have the opportunity to review, Ms. Gaston was limited to the full range of light work (R. 24).

The failure to consider a claimant's obesity may be harmless error if the obesity does not impair the claimant's ability to work or contribute to any of the claimant's physical limitations. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (finding ALJ's failure to consider obesity was harmless error where no medical opinion or evidence in record identified claimant's obesity as contributing to any of her physical limitations and claimant failed to specify how her obesity further impaired her ability to work); *see also Skarbek*, 390 F.3d at 504 (finding that ALJ's failure to consider claimant's obesity was harmless error where claimant merely speculated that his obesity made it more difficult for him to stand and walk). The record before us, however, does not allow us to determine how Ms. Gaston's alleged obesity contributes to her physical limitations or impairs her ability to work.

In determining a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of